The OUTLET COMPANY and Baxter Gentry, Appellants,

v.

INTERNATIONAL SECURITY GROUP, INC. and Richard Medlin, Appellees.

No. 04–83–00602–CV.

Court of Appeals of Texas, San Antonio.

April 24, 1985.

Rehearing Denied June 12, 1985.

Paul M. Green, Mark J. Cannan, Lang, Cross & Ladon Firm, San Antonio, for appellants.

James L. Branton, Susan Combs, San Antonio, for appellees.

Before BUTTS, TIJERINA and STOREY *, JJ.

* Assigned to this case by the Chief Justice of the Supreme Court of Texas as authorized pursuant

## OPINION

STOREY, Justice (Assigned).

Richard C. Medlin sued The Outlet Company, the operator of television station KSAT, for libel arising out of a television news broadcast which alleged that Medlin was engaged in a multi-million dollar gun smuggling scheme. The trial court's judgment awarded Medlin general, special and exemplary damages totaling $1,600,000.00 based upon jury findings of falsity and malice. Among its several points of error the broadcaster urges that Medlin could not sustain a cause of action for libel because he had before trial waived any right to recover for injury to his reputation. Additionally, the broadcaster complains that the broadcast was not proved to be directed to Medlin, that it was not proved to be false, and that the evidence was legally and factually insufficient to support the finding of malice and the various elements of damage. We conclude that no reversible error is shown in the points of error presented for review. We conclude further, however, that the damages awarded are excessive and that this case must be reversed and remanded unless appropriate remittitur is filed.

The threshold question presented is whether an action for libel may be maintained in the face of an affirmative waiver of damages for injury to reputation as an element of actual damages. The broadcaster seems to contend that, while other compensable injuries may result from a defamation, they must be predicated upon an injury to reputation and that claims not predicated upon such injury are by definition not actions for defamation. On the other hand, Medlin points to the disjunctive language of the Texas libel statute, TEX. REV.CIV.STAT.ANN. art. 5430 (Vernon 1958) as setting forth at least four distinct ways, including injury to reputation, by which an individual may suffer injury from defamation. Alternatively, Medlin contends that he did not waive his cause of action for injury to reputation, but only

to Paragraph (d) of Article 1812, Texas Revised Civil Statutes as amended by H.B. 2244 (Acts

waived the injury to reputation as an element to be considered in determining his actual damages.

■ We look to the nature of the waiver presented to the trial court. At or near the time of trial Medlin presented a motion in limine requesting the court to exclude "any testimony as to plaintiff's character or reputation in the community, as plaintiff hereby waives damages to reputation as an issue." The parties consider this motion to be in the nature of a stipulation. Taken with the further colloquy among the court and lawyers as shown in the record we understand this stipulation to be a "waiver" not of the injury to reputation but instead as a waiver of one element to be considered by the jury in assessing general or actual damage. This was obviously the interpretation of the trial court because it defined actual damages to "include mental anguish and suffering, humiliation and embarrassment" while omitting any reference to damage to reputation in its definition.

■ Furthermore, a false statement which charges a person with the commission of a crime, as is the case here, is libelous per se and "the law presumes a statement which is libelous per se defames a person and injures his reputation." *Leyendecker & Associates, Inc. v. Wechter*, 683 S.W.2d 369 (1984) (on rehearing). Because of this presumption, Medlin was entitled to recover his actual damages for mental anguish without offering proof of injury to his reputation. *Id.* at 374. We observe in this connection that neither party offered evidence concerning reputation and that no complaint is made on appeal of the admission or exclusion of such evidence. Additionally, no attempt was made by bill of exception or otherwise to demonstrate an attack upon reputation in mitigation of damages. Having concluded that Medlin did not waive his cause of action for libel by waiving injury to reputation as an element of damages we proceed to the broadcaster's remaining points of error.

1983, 68th Leg., p. 1912, Ch. 354, Sec. 1, effective June 16, 1983).

The broadcaster contends that there was no evidence or insufficient evidence to show that the broadcasts were "of and concerning" Medlin. The jury found that the broadcasts would lead ordinary persons to believe that Medlin was involved in "gun smuggling." The texts of the two broadcasts were as follows:

## BROADCASTS

### PRE–BROADCAST

MICHELLE MARSH: A multi-million dollar gun smuggling scheme, some controversial decisions by the U.S. Supreme Court, and a dollar that looks like a quarter, but it's still worth 100 pennies. Those stories and much more, coming up.

### JULY 2nd

MICHELLE MARSH: Newswatch has learned that a federal investigation is underway into a multi-million dollar business in San Antonio. A business, allegedly dealing with gun smuggling. Baxter Gentry reports.

BAXTER GENTRY: This is an investigation looking into the alleged flow of weapons from San Antonio into Central America. It's pointed at an elite security business here in San Antonio. This is the International Security Group, a San Antonio based firm in a warehouse district on the city's northeast side. ISG provides protection for businessmen and high government officials against terrorism attacks. Most of the clients are from Latin America. Building highly sophisticated bullet proof cars and training bodyguards are two aspects of this business that has grossed 6 million dollars so far this year. One former employee of ISG is afraid of appearing on camera, but he talked with us about how the company was allegedly involved in smuggling weapons.

QUESTION: How were you involved?

ANSWER: I loaded shotguns and ammo into secret compartments in the cars.

QUESTION: Where were they going?

ANSWER: To Guatemala I think.

QUESTION: Did you know it was illegal to do that?

ANSWER: I asked, but never got an answer.

Ron Wolters, the agent in charge of the Federal Firearms Office does not [sic] have an answer. It is illegal. Wolters says his investigators are looking into the alleged scheme but would not comment on any specific questions.

We were allowed inside the plant to talk with ISG President Richard Medlin. Medlin says the charges are unfounded and that the man in our report is simply a disgruntled employee trying to make his company look bad. Medlin, who refused to appear on camera for security reasons, says that neither he or [sic] his company have ever been involved in smuggling guns.

### JULY 3rd

MICHELLE MARSH: Last night we stated during this newscast that authorities were investigating a multi-million dollar gun smuggling scheme. We'd like to clarify that statement. The possibility that the people at the International Security Group based here in San Antonio are or have been involved in gun smuggling is under investigation. The extent of such an operation or the amount of money involved is not known. The management at International Security Group denies any knowledge of such a gun smuggling operation and today asked that all employees with knowledge of such an operation to take that information to proper authorities.

 It has been held that, with respect to identity, the asserted libel must refer to some ascertained or ascertainable person. The individual need not be named if those who knew him understand from the publication that it referred to him. *Newspapers, Inc. v. Matthews*, 161 Tex. 284, 339 S.W.2d 890, 894 (1960). We believe the

rule in Texas with respect to identity to be that set forth in W. PROSSER, HANDBOOK OF THE LAW OF TORTS 583 (2d ed. 1955):

> A publication may clearly be defamatory as to somebody, and yet on its face make no reference to the individual plaintiff ... He need not, of course, be named and the reference may be an indirect one; and it is not necessary that every listener understand it, so long as there are some who reasonably do.

*Id.* at 543, *cited with approval in Poe v. San Antonio Express News Corp.,* 590 S.W.2d 537, 542 (Tex.Civ.App.—San Antonio 1979, writ ref'd n.r.e.) and *Gibler v. Houston Post Co.,* 310 S.W.2d 377, 385 (Tex.Civ.App.—Houston 1958, writ ref'd n.r.e.). Here, Medlin was known to be the president of International Security Group, Inc. and its sole stockholder. Hence, he was identified by name as well as by the phrase "the management." There was no evidence offered tending to prove the broadcast was not directed to Medlin. We are persuaded that the texts themselves point directly to Medlin and taken with the testimony of witnesses who so understood the broadcast, the jury finding in this respect is amply supported.

■ Nor can we agree with the broadcaster's contention that Medlin was shown to be a public figure. There is no evidence that he assumed any role of special prominence in society or that he had thrust himself to the forefront of any particular public controversy in order to influence its resolution, the tests laid down in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789, 808 (1974). Of course, the broadcasts themselves could not serve to make Medlin a public figure. *Hutchinson v. Proxmire,* 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411, 431 (1979). While it is generally conceded that the question of whether a defamation plaintiff is a public figure is one for decision by the court, we conclude that no harm resulted in submitting the question to the jury in this case.

The broadcaster next complains that there was no evidence or, alternatively, insufficient evidence to support certain of the jury findings. The jury found that the broadcast taken as a whole had the effect of causing ordinary persons to believe that Medlin was involved in the criminal activity of gun smuggling. It found further that the published statement was false, that the broadcasters knew or should have known the statement was false, that the subject matter would warn a prudent broadcaster of its defamatory potential, that the broadcasters failed to use ordinary care, that "from clear and convincing evidence" the broadcasters were motivated by malice, and that the broadcasts were made with gross indifference or reckless disregard amounting to willful conduct. The jury also found the broadcasts were not fair, true and impartial accounts of a matter of public concern. Specifically, the broadcaster questions the evidentiary support for the findings of falsity, malice and willful conduct.

■ Consistent with the Supreme Court's holding in *Gertz,* the Texas Supreme Court in *Foster v. Laredo Newspapers, Inc.,* 541 S.W.2d 809 (Tex.1976), adopted the simple negligence standard for determining liability in the case of libel against a private individual. However, as required by *Gertz,* if this lesser standard is employed the individual may recover only actual damages, and the negligence finding may not be predicated upon a factual misstatement whose content would not warn a reasonably prudent editor of its defamatory potential. *Foster,* 541 S.W.2d at 819–20. Here, therefore, if the finding of falsity is supported in the evidence Medlin is entitled to recover his actual damages because of the finding of fault, that is, negligence, and the further finding that the broadcaster should have been warned of the statement's defamatory potential—two findings whose evidentiary support are not questioned. Thus, the only remaining evidentiary attacks on appeal are to the findings of falsity, malice and willful conduct. We will review at one time the evidence as it relates to these findings.

In discharging his burden of proving the falsity of the broadcaster's assertions, Medlin testified that neither he nor International Security Group were ever involved in gun smuggling. Four other witnesses who were closely related to the affairs of International Security Group confirmed this testimony. Additionally, Ron Wolters, the agent in charge of the local Bureau of Alcohol, Tobacco & Firearms, testified that his earlier investigations of International Security Group had uncovered no evidence of gun smuggling. Wolters also testified that there was no investigation under way at the time of the broadcast.

On the other hand, the broadcaster presented no direct evidence at trial tending to connect Medlin with a gun smuggling scheme. Its only evidence was the text of the broadcast which quoted an anonymous source as stating "I loaded shotguns and ammo into secret compartments in the cars." And in response to the question "Where were they going?" the source stated, "To Guatemala I think." The anonymous source remains anonymous and, of course, did not testify at trial. This exchange, is at best equivocal, but even if taken to mean that both cars and guns were going to Guatemala, it was hearsay and, consequently, without probative effect to demonstrate in fact that gun smuggling was in progress. Additionally, Baxter Gentry, the news reporter, testified at trial that his source never told him there were secret compartments in the vehicles or that any weapons ever left the gates of International Security Group.

■■■■ While the burden is on Medlin to prove the falsity of the broadcaster's assertions rather than on the broadcaster to prove their truth, *see A.H. Belo Corp. v. Rayzor*, 644 S.W.2d 71, 80 (Tex.App.—Fort Worth 1982, writ ref'd n.r.e.), we are persuaded that Medlin has sustained his burden and that the jury finding of falsity is supported in the evidence. We conclude, therefore, that having proved the defamatory statement, fault, knowledge of defamatory potential and falsity, the tests set forth in *Foster v. Laredo Newspapers, Inc.*

have been met, and, because the statement was libelous per se, Medlin is entitled to recover his actual damages for mental anguish without proof of other injury. Additionally, upon the same proof an award of special damages is authorized if such damages are shown to exist.

■■■■ We now consider the propriety of the award of exemplary damages. It is clear that exemplary damages are recoverable only upon a finding from "clear and convincing evidence" that the defamatory statement was made from malice. Malice may be established by proving knowledge of falsity, the constitutional standard, or by proving reckless disregard amounting to willful conduct,—the so called "ill will" standard. *See Gertz*, 418 U.S. at 342, 94 S.Ct. at 3008, 41 L.Ed.2d at 807. A finding with respect to either standard which is supported by the requisite proof is sufficient. Furthermore, this court must independently decide whether the evidence in the record affords "clear and convincing" proof. *Bose v. Consumers Union of United States, Inc.*, 466 U.S. 485, ——, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502, 523 (1984), *see also, New York Times v. Sullivan*, 376 U.S. 254, 285, 84 S.Ct. 710, 729, 11 L.Ed.2d 686, 709 (1964).

Here, the jury found malice which was defined in *New York Times v. Sullivan* as "made ... with knowledge that it was false or with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706. In a separate issue the jury found the statement was "made with gross indifference to or reckless disregard of the rights of Mr. Medlin so as to amount to a willful or wanton act." The broadcaster urges that there is no evidence and, alternatively, insufficient evidence to support these findings. We cannot agree.

■■■■ The reporter, Gentry, virtually conceded that he made no effort to verify the assertions of his unnamed source or the statements contained in the broadcast. The failure to investigate without more cannot establish reckless disregard for truth. *Gertz*, 418 U.S. at 332, 94 S.Ct. at

3003, 41 L.Ed.2d at 801. In connection with the failure to investigate, however, we deem it important to observe that the subject matter of this broadcast was found by the jury to be such that a prudent broadcaster should be aware of its defamatory potential. The jury finding to this effect is not attacked on appeal. With knowledge of this potential it would seem appropriate that the failure to investigate should take on greater significance. In this context we review the additional evidence which goes to support the jury finding of actual malice.

The reporter, Gentry, videotaped and recorded the interview with his anonymous source before interviewing Medlin. The Medlin interview resulted in a categorical denial of any wrongdoing, yet the source interview was aired as originally taped. Indeed, Gentry testified that his purpose in interviewing Medlin was "to get a reaction or response" rather than to ascertain the accuracy of the "source" information. For example, there was uncontroverted testimony at trial that the vehicles in question were not equipped with secret compartments capable of storing weapons, yet no effort was made at the plant-site interview with Medlin to inspect any vehicle for secret compartments. These circumstances would tend to demonstrate that the broadcast was in the making without concern for what further investigation might disclose.

Furthermore, it is apparent that the broadcast was "staged" so as to depict a "cloak and dagger" episode. The video showed the anonymous source in shadows so as to conceal his identity with a voice-over by Gentry narrating the interview. The video included background graphics of weapons, and scenes of armed men in dark glasses riding in black Cadillacs. These circumstances tended to demonstrate an effort to dramatize and sensationalize rather than to report essential facts.

The video broadcast included footage of the Bureau of Alcohol, Tobacco & Firearms agent, with voice-over by Gentry. This created the illusion of a live interview in which Wolters was affirming that gun smuggling was illegal, and that an investigation into gun smuggling activities was presently underway. Yet at trial Wolters testified that he had not appeared on camera during the interview with Gentry. Wolters' testimony in this regard was uncontroverted and the only reasonable inference to be drawn is that file footage of Wolters was used in an attempt to lend authenticity to the narration. Wolters testified that he could not have stated to Gentry that an investigation was underway because, in fact, there was none. While in the broadcast, Gentry quoted his source as saying "I loaded shotguns and ammo into secret compartments in the cars," he, Gentry, testified at trial that he was never told of secret compartments. He testified further that he had never heard that any cars carrying weapons had left the gates of the International Security Group plant.

Finally, considerable testimony by media experts was presented at trial which criticized adversely the investigative reporting resulting in this broadcast. We find it unnecessary to evaluate this testimony. We are persuaded that the foregoing facts taken with the failure to verify—with knowledge of defamatory potential—and a lack of any competent evidence that a gun smuggling scheme was in fact underway, are sufficient to support the jury finding of actual malice.

 The broadcaster urges that the actual damages awarded by the jury bear no relationship to those proved at trial—it suggests a remittitur but suggests no amount. We agree that the award is so excessive as to compel the conclusion that the jury acted from passion, prejudice or some other improper motive and that remittitur should be ordered.

"Actual damage" was defined by the trial court to "include mental anguish and suffering, humiliation and embarrassment." The proof of this injury was supplied wholly by the testimony of Medlin and his wife. Medlin testified that he experienced "anger and hurt." A meeting with his employees to discuss the allegations made by the broadcasts resulted in "one of probably the hardest times in my life."

Mrs. Medlin characterized Medlin as being "shocked and embarrassed" and "I know it was hard for him to deal with all the phone calls and having to explain ... it was very frustrating." Yet, Mrs. Medlin acknowledged that none of the friends and relatives who called believed that Medlin was engaged in illegal activity. No further evidence of injury was offered.

▉▉▉▉▉ There is no certain standard by which personal injury damages may be ascertained. Each case must stand on its own facts and review of other cases offer little help. The uncertainty is compounded where, as here, the injury is mental anguish not associated with bodily injury. Mental anguish has been characterized as " 'intense pain of body or mind' " and as a " 'high degree of mental suffering.' ... It must be something more than worry and vexation...." *McAllen Coca Cola Bottling Co., Inc. v. Alvarez*, 581 S.W.2d 201, 205 (Tex.Civ.App.—Corpus Christi 1979, no writ). It must be more than mere disappointment, anger, resentment or embarrassment. *Gill v. Snow*, 644 S.W.2d 222, 224 (Tex.App.—Fort Worth 1982, no writ).

▉▉▉▉▉ We view the injury proved here as transitory in nature—little more than anger, embarrassment and frustration. A different conclusion might be reached had not Medlin waived injury to reputation as an element of his damages. A different question would then be presented because of the "presumed" injury, its severity and continuing nature. Here, the jury could not presume damages but was bound by the proof offered on the issue of mental anguish. For these reasons, we are compelled to the conclusion that the jury acted from passion, prejudice or some other improper motive in arriving at actual damages. The result is so excessive as to "shock the sense of justice and conscience of this court," and dictates that we order a remittitur of one-half the jury award.

For yet another reason we are persuaded that remittitur is appropriate in this case. The U.S. Supreme Court has consistently cautioned state courts with respect to the delicate line to be observed in considering the impact of defamation law upon the first amendment freedoms of speech and press. An example is found in *Gertz v. Robert Welch, Inc.*:

> The largely uncontrolled discretion of juries to award damages where there is no loss unnecessarily compounds the potential of any system of liability for defamatory falsehood to inhibit the vigorous exercise of First Amendment freedoms.... More to the point, the States have no substantial interest in securing for plaintiffs such as this petitioner gratuitous awards of money damages far in excess of any actual injury.

> \* \* \* \* \* \*

> [A]nd all awards must be supported by competent evidence concerning the injury....

418 U.S. 323, 349–50, 94 S.Ct. 2997, 3011–12, 41 L.Ed.2d 789, 811 (1974). We consider this court no less bound to observe the fine line existing between these first amendment rights.

▉▉▉▉▉ For like reasons we consider the jury award of $1,000,000.00 as punitive damages to be excessive. In this regard we reject the broadcaster's contention that the award of punitive damages against a media defendant is unconstitutional as a prior restraint upon the exercise of a constitutional right. *See id.* at 349, 94 S.Ct. at 3011–12, 41 L.Ed.2d at 811. However, it is clear that the courts consider the punishment of error as running the risk of "inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press.... [which] may lead to intolerable self-censorship." *Id.* at 340, 94 S.Ct. at 3007, 41 L.Ed.2d at 805–06.

Here, Medlin has recovered his actual as well as his special damages. Consequently, little is left to be served by the award of punitive damages except to punish and to set an example for others—both inviting a cautious and restrictive exercise of free speech and press. This consideration together with the circumstances which we have considered with respect to the actual damage award lead us to conclude that the

punitive damage award is excessive. We will therefore order that one-half of the punitive damages awarded be remitted.

The broadcaster also complains of the admission of certain testimony offered to prove special damages, that is, Medlin's economic loss arising out of loss in value of his stock in International Security Group. Specifically, complaint is made of expert testimony projecting profits and expert opinion evidence based on assumptions not supported by the evidence. We do not understand the broadcaster to dispute the fact that economic loss was suffered, or to complain that the amount of the loss as found by the jury was excessive.

The record shows that International Security Group commenced the manufacture and sale of security vehicles in January 1977. At the time of the broadcast in July 1979, it was selling in about 28 foreign countries and employed about 198 workers. Individual sales of vehicles in 1977 numbered 50, in 1978 about 120, and the first six months of 1979 about 190. Gross sales in 1977 and 1978 totaled about $2 million and $4.3 million dollars yielding profits of $8,000.00 and $132,000.00 respectively. Gross sales for the first six months of 1979 were $6 million, and after the broadcast no sales were made. International Security Group soon after became bankrupt.

The testimony is conflicting regarding the reasons for International Security Group's failure—whether because its suppliers and credit sources withdrew their support because of the broadcast, or because of other reasons not directly related to the broadcast. The jury obviously believed the broadcasts to be a significant reason because it awarded Medlin $100,-000.00 as special damages arising out of loss of value in his stock. This was a small fraction of the value to which Medlin's experts testified.

The broadcaster complains that the court erred in allowing Medlin's expert to project profits because the business did not have a history of profits. It also complains that the expert, in calculating the value of the business, assumed as an intangible asset certain patents which Medlin had never assigned to the International Security Group. We conclude that if admission of this testimony was error, it was harmless. We are thus persuaded, first, because the jury awarded only a fraction of the value asserted. Second, and more importantly, the uncontroverted evidence shows that in 1978 Medlin paid $120,000.00 for 10% of the stock of International Security Group. There is no claim that this sale and purchase was not an arm's length transaction, and we believe it to be the most reliable evidence of the value of Medlin's stock before the broadcast. Here also, the jury's award is a small fraction of the value demonstrated by this evidence. We find no reason in the record to disturb the jury's finding with respect to special damages.

The broadcaster next urges that the court erred in submitting three special issues which it claims to be duplicitous of other issues thus "highlighting plaintiff's case." We are not persuaded that the issues are duplicitous or immaterial. Rather, it appears that out of an abundance of caution the court submitted issues which were shades of others submitted. For example, in Issue No. 3 the court applied the ordinary negligence standard to knowledge of falsity. Issue No. 5 applied the same standard to the act of making the broadcast and Issue No. 8 inquired of the *New York Times* standard of malice. Under the holdings of *Gertz* and *Foster* none of these issues are immaterial because ordinary negligence is necessary to show a right to actual damages and a finding of malice is necessary for punitive damages.

Similarly, Issue No. 8, the *New York Times* standard for malice, and Issue No. 9, the Texas common law standard for malice, are shades of one another. While *Foster* seemed to adopt the *New York Times* standard, the common law standard has never been disapproved. Although an affirmative answer to either issue is sufficient to support an award for punitive dam-

ages, we cannot agree that the court erred in submitting both.

▆▆▆▆ We do not consider Special Issue No. 5 to be duplicitous of any other issue. This issue inquired whether the content of the broadcast would warn a prudent broadcaster of its defamatory potential. Both *Gertz* and *Foster* teach that a defamation may not be predicated upon a factual misstatement unless the content of the statement would warn a prudent broadcaster of its defamatory potential. Finally, we observe that there is nothing inherently prejudicial in submitting an immaterial issue. Our standard of review is to determine if the unnecessary issues amounted to such a denial of rights as was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *Fisher v. Leach*, 221 S.W.2d 384, 390 (Tex. Civ.App.—San Antonio 1949, writ ref'd n.r. e.); TEX.R.CIV.P. 434. We conclude that such is not shown in this case.

▆▆▆▆ The broadcaster next complains that the court erred in admitting into evidence certain "stilled" portions of the video broadcast. It argues that separate scenes and sentences of a defamatory statement may not be isolated from the whole and independently examined. Here it appears that the stills were offered in connection with the examination of the reporter, Gentry, for the purpose of demonstrating the editing process by which the entire broadcast was prepared. These circumstances are distinguished from those in *Houston v. Interstate Circuit, Inc.* 132 S.W.2d 903 (Tex.Civ.App.—Galveston 1939, no writ), relied upon by the broadcaster. There the question was whether the motion picture as a whole was libelous. Here the entire text of the broadcast was before the jury as was the entire video portion. The same effect could be accomplished by stopping the video at selected intervals and the broadcaster makes no effort to show how the continuous showing of the entire broadcast might have persuaded the jury that the statement was not false. In short, the broadcaster has not attempted to demonstrate that it was prejudiced in any way.

We conclude that if error existed, it was harmless.

▆▆▆▆ Finally, the broadcaster complains that Medlin was allowed to impeach the testimony of an earlier witness without having established a predicate for the impeaching testimony. We cannot agree that a predicate was not established. The next to last witness to testify was John Yoggerst, a bank loan officer, who testified that the broadcasts did not affect his loan committee's decision to turn down a loan to International Security Group. When Yoggerst had left the courtroom, Medlin, the final witness, was allowed to take the stand and controvert his testimony. We view Medlin's testimony as merely cumulative of other testimony before the jury, because early in the trial there was considerable testimony that International Security Group's failure was partially caused by the refusal of suppliers and lenders to extend further credit. The admission of this cumulative testimony does not demonstrate such an abuse of discretion by the trial court as to warrant reversal.

We conclude, therefore, that the points of error presented for review contain no grounds for reversal; however, we are persuaded that the amounts awarded as actual and punitive damages are excessive. Consequently, the case must be reversed unless a remittitur is filed for the excess. We grant the appellee fifteen (15) days from the date of our judgment to remit one-half of the actual damages and one-half of the punitive damages found—a total remittitur of $750,000.00; otherwise, the case will be reversed and remanded for a new trial.

Affirmed on condition of remittitur.