Joe Ed BUNTON and Jackie
Gates, Appellants,

v.

Bascom BENTLEY, III, Appellee.

No. 12–97–00376–CV.

Court of Appeals of Texas,
Tyler.

Oct. 22, 1999.

Rehearing Overruled Dec. 30, 1999.

Ronald Dee Wren, Armando De Diego, for appellants.

Mike Hatchell, Tyler, for appellee.

Panel consisted of RAMEY, JR., C.J., HADDEN, J., and WORTHEN, J.

TOM B. RAMEY, Jr., Chief Justice.

Joe Ed Bunton and Jackie Gates appeal from an adverse judgment finding them liable for defamation and conspiracy to defame a public official, Judge Bascom Bentley, III. The jury awarded substantial amounts in actual and exemplary damages. Bunton and Gates assert their entitlement to judgment as a matter of law and attack the sufficiency of the evidence to support the liability findings and the damage awards. Gates also asserts numerous charge errors. Bentley asserts the trial court erred in not imposing joint and several liability on Bunton and Gates. We affirm in part and reverse and render in part.

### FACTS

Bunton was a founder and host of a local weekly cable television show called "Questions and Answers" ("Q & A"). The program provided a public forum to discuss local issues. Viewers were encouraged to call in to voice their opinions, ask questions, and share information about the subject under discussion during the show. Bentley, a district judge in Anderson and Cherokee Counties, was often selected as a topic to be discussed on the show. Bunton first aired his criticisms of Bentley on the June 6, 1995 show. On numerous occa-

sions thereafter, Bunton, while hosting the show, called Bentley "corrupt." Once, Bunton called Bentley "criminal." Gates joined the show as a host or co-host in July 1995. Bentley sued Bunton, Gates, and others[1] for defamation and conspiracy to defame. At the close of Bentley's case, the trial court ruled as a matter of law that Bunton's statements constitute slander *per se.* The jury found actual malice and the existence of a conspiracy. The trial court entered judgment based on the jury's damage awards, assessing against Bunton $7,150,000 in actual damages and $1,000,000 in exemplary damages and assessing against Gates $95,000 in actual damages and $50,000 in exemplary damages.

## BUNTON'S ACTUAL MALICE

In his first issue, Bunton asserts that the trial court should have rendered judgment for him as a matter of law because there is no evidence, or factually insufficient evidence, that any defamatory statement he made was uttered with actual malice. We interpret this point to be an attack on the trial court's denial of Bunton's motion for judgment notwithstanding the verdict to the extent that the motion attacks the actual malice finding.[2] In his third issue, Bunton contends the evidence is legally and factually insufficient to support the jury's finding of actual malice. Bunton argues, in essence, that he had numerous bases for believing Bentley to be corrupt and a criminal which were true, and therefore, Bentley did not satisfy the requirement of showing that Bunton knew the allegations were false or had doubts as to their truthfulness.

### Standard of Review

A motion for judgment notwithstanding the verdict should be granted when the evidence is conclusive and one party is entitled to judgment as a matter of law. *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227–28 (Tex.1990). In reviewing the denial of a motion for judgment notwithstanding the verdict, we review the evidence in the light most favorable to the jury findings, considering only the evidence and inferences that support them, and disregarding all evidence and inferences to the contrary. *Navarette v. Temple Indep. Sch. Dist.,* 706 S.W.2d 308, 309 (Tex.1986). If there is more than a scintilla of evidence to support the findings, the motion for judgment notwithstanding the verdict was properly denied. *Mancorp,* 802 S.W.2d at 228.

If a party is attacking the factual sufficiency of an adverse finding on an issue to which the other party had the burden of proof, the attacking party must demonstrate that there is insufficient evidence to support the adverse finding. *See Croucher,* 660 S.W.2d at 58. In addressing a factual sufficiency of the evidence challenge, this Court must consider and weigh all of the evidence and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). This Court is not a fact finder and may not pass on the credibility of the witnesses or substitute its judgment for that of the trier of fact. *Clancy v. Zale Corp.,* 705 S.W.2d 820, 826 (Tex.App.—Dallas 1986, writ ref'd n.r.e.). Findings of fact are the exclusive province of the jury and/or trial court.

---

1. Bentley also sued several other individuals who were associated with the show. The suits against those defendants were dismissed and they are not parties to this appeal.

2. Bunton is before this Court *pro se.* We are obligated to liberally construe briefs and the points therein. *Anderson v. Gilbert,* 897 S.W.2d 783, 784 (Tex.1995).

*Bellefonte Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742, 744 (Tex.1986). Accordingly, if there is sufficient competent evidence of probative force to support the finding, it must be sustained. *Beall v. Ditmore*, 867 S.W.2d 791, 795–96 (Tex. App.—El Paso 1993, writ denied). Where there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. *Id.* at 796.

### Applicable Law

 Slander is an orally communicated or published defamatory statement made to a third person, without legal excuse, which is either defamatory in itself or defamatory because it results in actual damages. *Simmons v. Ware*, 920 S.W.2d 438, 444 (Tex.App.—Amarillo 1996, no writ). Statements are slanderous *per se* if they affect a person injuriously in his office, profession, or occupation. *Id.* at 451. If an oral statement unambiguously and falsely imputes criminal conduct to the plaintiff, it is slanderous *per se*. *Campbell v. Salazar*, 960 S.W.2d 719, 726 (Tex. App.—El Paso 1997, writ denied).

 The First Amendment to the United States Constitution prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with actual malice. *Carr v. Brasher*, 776 S.W.2d 567, 570–71 (Tex.1989). Actual malice is not ill will; it is the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true. *Id.* at 571. Reckless disregard is defined as a high degree of awareness of probable falsity, for proof of which the plaintiff must present sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. *Id.* Negligence, such as failure to investigate, does not constitute actu-

al malice. *Beck v. Lone Star Broadcasting, Co.*, 970 S.W.2d 610, 617 (Tex.App.—Tyler 1998, writ denied).

 It is not enough for the jury to disbelieve the defendant's testimony. *See Casso v. Brand*, 776 S.W.2d 551, 558 (Tex. 1989). We are required to make an independent assessment of the record to determine if actual malice was established by clear and convincing evidence. *Dolcefino v. Turner*, 987 S.W.2d 100, 111 (Tex. App.—Houston [14th Dist.] 1998, writ granted). Actual malice may be inferred from the relation of the parties, the circumstances attending the publication, the terms of the publication itself, and from the defendant's words or acts before, at, or after the time of the communication. *Id.*; *International & G.N.R. Co. v. Edmundson*, 222 S.W. 181, 184 (Tex. Comm'n App. 1920, holding approved). While evidence of ill will alone is not enough to establish actual malice, proof that the defendant entertained ill will toward the plaintiff is probative evidence that the defendant published the information either knowing of its falsity or with reckless disregard of its truth or falsity. *Town of South Padre Island v. Jacobs*, 736 S.W.2d 134, 140 (Tex. App.—Corpus Christi 1986, writ denied).

### Discussion

 Bentley presented evidence addressing each of Bunton's bases for his defamatory remarks. Even after hearing the evidence showing that his reliance on these bases was misplaced, as we shall detail under Bunton's second issue, Bunton reasserted his claim that Bentley was corrupt and a criminal. In determining the existence of actual malice, this Court can consider Bunton's words before, at, and after the offending communication. *See Dolcefino*, 987 S.W.2d at 111. Bunton's continued assertion of the defamatory statements in light of the evidence at trial

eroding his bases for believing them, demonstrates that Bunton made the defamatory statements with reckless disregard of the truth or falsity of the statements.

Tucker Farris, a local businessman, testified that he had a conversation with Bunton in the summer of 1995. Bunton told Farris that he wanted to expose anything not right with Anderson County politics and that he had information on quite a few in the "clique." However, Bunton said to Farris that he had been unable to get anything on Bentley and that bothered him. Bunton told Farris, "I know he's doing something, I just don't know what."

 Bunton had been investigating Bentley's conduct for several months prior to this conversation. He made his first "on air" defamatory remarks about Bentley on June 6, 1995. Bunton's admission to Farris at a time near or possibly after Bunton's first defamatory remarks constitutes some evidence that he did not know whether his statements about Bentley were true or not. Further, the long term, repetitive, deliberate attacks demonstrate that Bunton entertained ill will toward Bentley; this constituted probative evidence that Bunton published the defamatory information either knowing of its falsity or with reckless disregard of its truth or falsity. *See Jacobs,* 736 S.W.2d at 140. Accordingly, as the record includes more than a scintilla of evidence of the existence of actual malice, the trial court did not err in denying Bunton's motion for judgment notwithstanding the verdict. *Mancorp,* 802 S.W.2d at 228. *See ACS Investors, Inc.,* 943 S.W.2d at 430.

 Bunton's factual sufficiency complaint also fails. Because at trial Bunton emphatically stated that all of his statements about Bentley were true, Farris's testimony that, in the summer of 1995, Bunton told him that he had no harmful information about Bentley, constitutes con-

flicting evidence. Further, Bunton denied making the comments with malice. Due to the existence of conflicting evidence, we regard the jury's verdict on this issue to be conclusive. *See Beall,* 867 S.W.2d at 795–96. We hold that actual malice was established by clear and convincing evidence. The evidence is factually sufficient to support the jury's actual malice finding. We overrule Bunton's first and third issues.

### BUNTON'S DEFENSE

In his second issue, Bunton contends the trial court should have rendered judgment in his favor because Bentley failed to prove that any statement Bunton made was false. Bunton named nine bases for believing that Bentley is corrupt and a criminal. In each situation, Bunton asserted that Bentley violated the Code of Judicial Conduct or committed the crime of abuse of official capacity, thereby making him corrupt and a criminal.

 Truth of the defamatory statements is an affirmative defense. *Jacobs,* 736 S.W.2d at 140. The burden of proving truth is on the defendant. *Id.*

 Four of Bunton's complaints involve defendants who appeared in Bentley's court. In three of these cases, the evidence shows that Bentley made mistakes of law. The cases continued through the justice system and the mistakes were rectified as contemplated by the system. There was no evidence of any wrongdoing on Bentley's part in these cases. In the fourth of these cases, Bunton's complaint centers on the State's motion to adjudicate, which was filed but never heard or ruled on by Bentley. The evidence shows that the motion was not set for a hearing because the prosecuting attorney, after discussions with the defendant's attorney and probation officer, agreed to continue

the defendant on probation and imposed new probationary terms. As the prosecutor did not intend to press for adjudication, there was no occasion for a hearing. Again, there was no showing of any wrongdoing on Bentley's part.

■ Bunton asserted that Bentley failed to uphold the law because he did not force the sheriff to arrest and jail an accused after an arrest warrant was issued for him. The charges against the accused were not pending in Bentley's court. Trial court jurisdiction is comprised of the power of the court over the subject matter of the case coupled with personal jurisdiction over the accused. *Fontenot v. State*, 932 S.W.2d 185, 190 (Tex.App.—Fort Worth 1996, no writ). Criminal jurisdiction over the person requires the due return of a felony indictment, or the accused's personal affirmative waiver thereof and the return of a valid information upon complaint. *Lackey v. State*, 574 S.W.2d 97, 100 (Tex. Cr.App. [Panel Op.] 1978). Judicial action without jurisdiction is void. *Fontenot*, 932 S.W.2d at 190. The jurisdiction of Bentley's court had not been invoked in this case. Therefore, Bentley had no authority to enforce the warrant. Further, the District Attorney recalled the warrant.

■ Bunton also complained that Bentley took no action with regard to two removal petitions Bunton filed against Anderson County District Attorney Jeff Herrington. Bunton's complaints against Herrington were investigated by a special prosecutor and heard and dismissed by judges other than Bentley. Bunton contends that the judges who dismissed the petitions violated the law, that Bentley knew that, and should have reported them. The special prosecutor testified that she found no wrongdoing by Bentley. Further, even assuming the other judges involved did not follow the law in handling the petitions, a district judge is under no duty to ensure compliance with the statutes by other judges.

■ In another complaint, Bunton asserts that Bentley should have taken action to require the District Attorney to comply with statutes requiring him to deposit certain funds in the county treasury. Bunton argues that Bentley, as a District Judge with supervisory responsibility over the Commissioners Court, should have obtained audits and made certain that the funds were deposited properly. The Texas Code of Criminal Procedure requires the District Attorney to deposit into the county treasury all fees collected in connection with bad checks and money obtained through forfeiture proceedings. *See* TEX. CODE CRIM. PROC. ANN. arts. 102.007 and 59.06 (Vernon Supp.1999). It appears that the District Attorney was not in compliance with the applicable statutes for some years in the early 1990's. Article five, section eight of the Texas Constitution and section 24.020 of the Texas Government Code vest district courts with appellate jurisdiction and general supervisory control over commissioners courts. *See* TEX. CONST. art. V, § 8; TEX. GOV'T CODE ANN. § 24.020 (Vernon 1988). The power contemplated, however, is little more than the authority to judicially review improper acts presented by a suit, mandamus, or like proceeding. *Tabor v. Hogan*, 955 S.W.2d 894, 896 (Tex.App.—Amarillo 1997, no writ). Neither proviso authorizes a district court to sit as the head of the commissioners court and thereby direct its actions. *Id.* No proceeding was ever instituted in Bentley's court, or any other court apparently, to obtain compliance with the statutes. Accordingly, it was not Bentley's responsibility to *sua sponte* obtain the District Attorney's compliance.

■ Finally, Bunton complained that Bentley made campaign contributions to

two county judge candidates after a primary but before the November election. Bunton contends this action violated the Code of Judicial Conduct's requirement that judges refrain from endorsing candidates for public office. *See* TEX.CODE JUD. CONDUCT, Canon 5(3), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. B (Vernon 1998). Bentley's campaign treasurer testified that he called the Secretary of State's office to determine whether the contributions would be inappropriate and was told it would not be improper. There is nothing in the record to show that the Commission on Judicial Conduct reviewed this issue. Even assuming that Bentley did violate Canon 5, he did not do so flagrantly. He believed he had appropriate approval. We determine that this possible instance of questionable behavior does not suggest that he is corrupt.

Because we find that none of Bunton's bases for calling Bentley corrupt or a criminal support his allegations, Bunton's truth defense must fail. Accordingly, we overrule Bunton's second issue.

### BUNTON'S DAMAGES

In his fourth issue, Bunton briefly contends that the evidence is not legally or factually sufficient to support the jury's award of $7,150,000 in actual damages. Alternatively, Bunton asserts that the award is excessive. Bunton argues that Bentley's evidence did not prove there had been "substantial disruption of his daily routine." Further, Bunton asserts that there is no evidence of any damage to Bentley's reputation.

#### Applicable Law

Damages recoverable in a slander case include compensation for injuries to reputation or character, mental anguish and other like wrongs incapable of money valuation. *Shearson Lehman Hutton, Inc.*

*v. Tucker*, 806 S.W.2d 914, 922 (Tex.App.—Corpus Christi 1991, writ dism'd w.o.j.). When the slander relates to the professional dealings of the plaintiff, and thus is slander *per se*, no independent proof of damage to the plaintiff's reputation or of mental anguish is required, as the slander itself gives rise to a presumption of these damages. *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex.1984). The damages resulting from slander are purely personal and cannot be measured by any fixed standard or rule. *Jacobs*, 736 S.W.2d at 142. The nature of the injury adds to the uncertainty. Mental anguish has been characterized as a high degree of mental suffering. *Outlet Co. v. International Sec. Group, Inc.*, 693 S.W.2d 621, 629 (Tex.App.—San Antonio 1985, writ ref'd n.r.e). It must be more than worry, vexation, anger or embarrassment. *Id.*

The amount to be awarded as damages in a slander case rests largely in the discretion of the jury. *Wal–Mart Stores, Inc. v. Odem*, 929 S.W.2d 513, 527 (Tex.App.—San Antonio 1996, writ denied) (on reh'g). In fixing the amount, the jury may consider the motives of the defendant, and the mode and extent of publication. *A.H. Belo v. Wren*, 63 Tex. 686, 727–28 (1884). We review the sufficiency of the evidence supporting an award of damages by the same standards as any factual question. The duty of this Court is to examine all the evidence and determine if the damages found by the jury are so against the evidence, or unsupported by evidence, as to be manifestly unjust. *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex.1986).

#### Discussion

Bentley testified that he has suffered. He said the Appellants ruined time with his family and friends and put a cloud over his home and four children. He testified that his name is of critical importance

to him and, as a judge, he needs to maintain his integrity and undertake to be a virtuous man. He stated that the defendants' actions hurt and disrupted his family. He also stated that since these attacks began he does not attend to family duties appropriately. He explained that many times he has sulked and worried when he should have been taking care of his family. He testified that the defendants' actions have affected his family's ability to enjoy each other. He also agreed, however, that there has been no disruption in his ability to perform as a judge, teach at a community college, and participate in community organizations and social activities. Bentley also testified that he has incurred no medical, psychiatric, psychological, therapeutic, or counseling expenses as a result of defendants' slander.

Carol Bentley, Judge Bentley's wife, described the situation created by the Appellants' slander as stressful and a "tragedy." She testified that it had ruined her husband's life and her children's lives. She explained that other kids laugh and joke about it to their children. She stated that her husband does not sleep. She testified that the defendants' slander took away Bentley's honor and integrity. She said his life will never be the same. One friend of Bentley's, Elton Bomer, testified that this case has made Bentley downcast, sad, and depressed. Another friend, Cliff Johnson, stated that the slander had a severe effect on Bentley and his family.

The jury awarded Bentley $100,000 for damages to his character and reputation that he suffered in the past, $50,000 for damages to his character and reputation that he probably will suffer in the future, $7,000,000 for past mental anguish, and zero for probable future mental anguish. Thus, Bentley's mental anguish in the past constitutes most of the actual damages found by the jury.

Mental anguish damages are purely personal and are not measured by any fixed standard or rule. *See Jacobs,* 736 S.W.2d at 142. Thus, the lack of a specific guide for such damage prevents us from making a clear determination that the past mental anguish should not exceed a certain level of recovery.

The evidence showed that Bentley committed his entire professional life to public service primarily as a judicial officer which the evidence showed to require untainted character and the highest integrity. Retention of his office depends upon the continued confidence in and approval of his reputation by the Anderson and Cherokee counties' electorate. The evidence further indicated that Bentley's reputation had been unsullied throughout his extended career. In June 1995, the slanderous statements and discussions commenced and were repeated often on numerous programs. The campaign against Bentley was staged over the period of a year and a half, broadcast to the public via local television. The untrue remarks were direct attacks upon Bentley's character including charges of criminality. The jury was required to gauge the effect of these assaults upon Bentley's mental well-being.

The jury, not a reviewing court, is peculiarly equipped to make the damage assessments. *See Clancy,* 705 S.W.2d at 826. The jury observed Bentley throughout the trial. The jury observed Bentley as he testified and his responses to cross-examination. The jury observed the other witnesses as they testified about the effects of the repeated character attacks upon him. There is nothing in the record to suggest that the jury was guided by anything other than a conscientious consideration of the evidence and the instructions of the trial court. We conclude that the evidence is legally and factually sufficient to support the jury's award of $7,150,000 in actual

damages assessed against Bunton. We overrule Bunton's and Gates's fourth issue.

### GATES'S LIABILITY FOR DEFAMATION

In his first issue, Gates asserts that the trial court erred in failing to render judgment for him as a matter of law on Bentley's defamation claim. He contends Bentley failed to offer any evidence that he made or published any defamatory statements about Bentley and that there is no evidence that any statement made by Gates about Bentley was false or that it was anything other than Gates's opinion. He also asserts that there is no evidence that any statement was made with actual malice.

### Standard of Review

 A directed or instructed verdict is proper when the evidence offered on a cause of action is insufficient to raise an issue of fact. *Collora v. Navarro*, 574 S.W.2d 65, 68 (Tex.1978). In reviewing the denial of a directed verdict, we review the evidence in the light most favorable to the nonmovant, disregarding all evidence to the contrary. *Id.* The trial court is to determine whether any evidence of probative force exists to raise fact issues on the material questions presented in the case. *Gonzales v. Hearst Corp.*, 930 S.W.2d 275, 277 (Tex.App.—Houston [14th Dist.] 1996, no writ). When the evidence raises a material issue of fact, or when reasonable minds may differ as to the truth of the controlling facts, an instructed verdict is not warranted, and it would be error for the trial court to instruct a verdict. *Id.* at 278. If there is any conflicting evidence of probative value, an instructed verdict is improper and the issue must go to the jury. *White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260, 262 (Tex.1983).

### Applicable Law

 Slander is a defamatory statement orally communicated or published to a third person without legal excuse. *Simmons*, 920 S.W.2d at 444. Public officials must establish a higher degree of fault than private individuals to recover for defamation. *Dolcefino*, 987 S.W.2d at 110. To sustain a defamation cause of action, a public official must prove that the defendant published a statement that was defamatory concerning the public official, and that the false statement was made with actual malice. *Id.* A statement is defamatory if the words tend to injure a person's reputation, exposing the person to public hatred, contempt, ridicule, or financial injury. *Campbell*, 960 S.W.2d at 725. Statements are slanderous *per se* if they affect a person injuriously in his office, profession, or occupation. *Simmons*, 920 S.W.2d at 451. Whether the words are reasonably capable of the defamatory meaning the plaintiff attributes to them is a question of law for the trial court. *Carr*, 776 S.W.2d at 570. Allegedly slanderous statements must be construed as a whole, in light of surrounding circumstances, based upon how a person of ordinary intelligence would perceive the entire statement. *Campbell*, 960 S.W.2d at 725. Only when the court determines the complained-of language to be ambiguous or of doubtful import should a jury be permitted to determine the statement's meaning and the effect the statement has upon the ordinary listener. *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987).

### Discussion

 In his motion for instructed verdict, Gates argued that he did not publish any defamatory statements concerning Bentley. He asserted that the evidence shows only Bunton made allegedly defama-

tory statements. Gates also contended that he made no statement about Bentley with actual malice. On appeal, Bentley responds that Gates aided, abetted, encouraged, ratified, and adopted Bunton's defamatory statements. He further asserts that Gates published as his own Bunton's allegations of corruption. Bentley does not identify any specific defamatory statement made by Gates.

Bentley complains of statements made on Q & A over a time period beginning June 6, 1995 and ending in December of 1996. Gates was not associated with the program in June 1995. He began volunteering as a host or co-host after July 11, 1995. In addition to acting as host, he also helped pay the phone bills. The record also shows that Gates had printed and gave business cards printed with his name and the name of the program, Q & A.

Bentley presented two video tapes containing excerpts of Q & A programs airing between June 1995 and December 1996. A large portion of the longer tape contains clips of shows that aired in June 1995. The majority of the excerpts of the two exhibits shows Bunton, as host of the program, explaining that he believes Bentley and others in local county government are corrupt. Gates appears as co-host in several of the excerpts. In four instances, Gates appears to be listening and/or reading from a paper he is holding. In other excerpts, he takes a more active role.

In one clip, Bunton talks to a caller and says that the district attorney is the most corrupt. Gates tries to tell him he had misspoken. Bunton says Bentley is the most corrupt and Gates replies "yeah." In another clip, Gates helps explain the contents of a fax they had received regarding new rules the district judges had recently instituted. Then, Bunton again begins talking about one of the reasons he feels Bentley is corrupt and Gates resumes his listening mode. In another excerpt, Gates is explaining to Bunton that Bentley violated the law in some regard. He uses his hands and appears very intense. Another excerpt shows Bunton, Gates, and a third man, not a party to this appeal; Bunton states that "we have talked" and "we" are going to establish the Bentley Hot Line. At the bottom of the screen are the words BENTLEY HOT LINE followed by a telephone number.

In one excerpt, only Gates and a woman not a party to this appeal are on screen. Gates talks about a conversation he had with Bentley. Gates states that Bentley told him "it was a dangerous game we play." Gates responded, "I don't know who is playing games and I don't play games." In another clip, Gates is apparently explaining where Bentley's office is. In the final clip portraying Gates's participation, Bunton is saying that Bentley is corrupt and listing the bases for that statement. Gates is listening and then adds to Bunton's list, helping him name the bases for his conclusion that Bentley was corrupt.

In reviewing the trial court's denial of Gates's motion for instructed verdict, we will review the record in the light most favorable to Bentley, disregarding all contrary evidence and inferences. *See Collora*, 574 S.W.2d at 68. Our review of the record shows that Gates was involved in the production of Q & A during the majority of the time period during which Bentley was a major topic of discussion and appeared on camera as a participant during some of the shows. Gates appeared to agree with Bunton when he said Bentley was corrupt, encouraged Bunton's comments, and, once, helped him list Bunton's reasons for those comments. Nothing Gates said, however, could tend to injure Bentley's reputation, or expose him to public hatred, contempt, ridicule, or financial

injury. In short, the evidence shows that Gates did not make or publish any defamatory statements. *See Campbell,* 960 S.W.2d at 725. Although this Court does not condone Gates's acquiescence to Bunton's acts of defamation, the evidence offered is insufficient to raise an issue of fact that Gates defamed Bentley. Because there is no conflicting evidence on the issue of whether Gates made or published a defamatory statement that Bentley was "corrupt" or a "criminal," Gates was entitled to judgment as a matter of law on Bentley's defamation cause of action, and the trial court erred in denying Gates's motion for instructed verdict. *See White,* 651 S.W.2d at 262. Accordingly, we sustain Gates's first issue.

### *JURY CHARGE*

In his second issue, Gates contends that the trial court erred in the manner in which it submitted questions one, two, three, and seven. Gates asserts that the trial court erred by submitting these liability questions as they were based on his agreement with Bunton's defamatory statements rather than on whether Gates himself made any defamatory statements. He complains the charge did not allow the jury to make a finding as to each element of defamation. He contends that the charge as given improperly allowed the jury to find him liable for damages based on his agreement with Bunton's statements, rather than on his own publication of defamatory statements. He argues that these charge defects constitute a complete omission of a defamation claim against Gates.

▇▇▇ Questions one, two, and three concerned Gates's liability for defamation. Question seven asked the jury whether Gates acted with malice and was based on an affirmative answer to question three. Our determination that the trial court should have granted Gates's motion for instructed verdict on Bentley's defamation cause of action made submission of questions one, two, and three improper. It follows that question seven was also improper. *See Musser,* 723 S.W.2d at 655. Accordingly, the findings thereon must be disregarded. Necessarily, the jury's award of actual damages against Gates in question nine is also improper and must be disregarded. To the extent discussed, we sustain Gates's second issue. We need not reach the remaining arguments under this issue. *See* TEX.R.APP. P. 47.1.

### *JOINT AND SEVERAL LIABILITY*

Bentley contends in one cross-point that the trial court erred in failing to include in the judgment a decree that Bunton and Gates, as co-conspirators, are jointly and severally liable for the actual damages awarded against Bunton.

### *Applicable Law*

▇▇▇ An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex.1983). Once a civil conspiracy is found, each co-conspirator is responsible for the action of any of the co-conspirators which is in furtherance of the unlawful combination. *Akin v. Dahl,* 661 S.W.2d 917, 921 (Tex.1983), *cert. denied,* 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984). Each element of the cause of action of defamation is imputed to each co-conspirator. *See id.* The concept of civil conspiracy is used, then, to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted, or encouraged his acts. *Carroll v. Timmers Chevrolet, Inc.,* 592 S.W.2d 922, 925–26 (Tex.1979). A finding of civil conspiracy imposes joint and several liability on all

co-conspirators for any actual damages resulting from the acts in furtherance of the conspiracy. *Hart v. Moore*, 952 S.W.2d 90, 98 (Tex.App.—Amarillo 1997, writ denied).

 Proof of a civil conspiracy is not, in and of itself, a recoverable harm. *Belz v. Belz*, 667 S.W.2d 240, 243 (Tex. App.—Dallas 1984, writ ref'd n.r.e.). "The gist of a civil conspiracy is the damage resulting from commission of a wrong which injures another, and not the conspiracy itself." *Schlumberger Well Surveying Corp. v. Nortex Oil and Gas Corp.*, 435 S.W.2d 854, 856 (Tex.1968). Any finding of conspiracy must be based on some underlying tort. *Schoellkopf v. Pledger*, 778 S.W.2d 897, 900 (Tex.App.—Dallas 1989, writ denied). It follows that in order to recover a judgment for civil conspiracy there must be a finding of damages resulting from that conspiracy. *Belz*, 667 S.W.2d at 243.

### *Discussion*

 The jury was asked in Question 5: Did Joe Ed Bunton and Jackie Gates enter into a civil conspiracy to publish defamatory statements about Bascom Bentley?
A "civil conspiracy" is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. To establish a civil conspiracy, there must be an agreement on the object or course of action and one or more unlawful, overt acts in furtherance of that object. The agreement need not be formal, the understanding may be tacit, and each conspirator need not know the details of the conspiracy.

Answer: Yes

Neither Bunton nor Gates has attacked this finding on appeal. We are bound by unchallenged jury findings. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). Bunton was found to have made defamatory statements with actual malice. The jury having found that a civil conspiracy existed, all elements of defamation are imputed to Gates and Gates became responsible for all actions by Bunton during the conspiracy. *See Akin*, 661 S.W.2d at 921.

In four separate questions, the jury was asked to determine the amount of actual damages and exemplary damages for which Bunton and Gates should each be liable. The jury, however, was not asked to determine what damages are attributable to the conspiracy. At the charge conference, Bentley objected to question nine, which inquires as to the amount of actual damages for which Gates should be held liable. His stated reason for the objection was that "the question does not take into account the joint and several liability rule of active participation set forth in *Belo v. Fuller*." [3] The record indicates that he presented the court with requested instructions and questions and the court overruled all of his objections. Bentley's requested instructions and questions, however, are not included in the appellate record.

 The Texas Rules of Civil Procedure require a party objecting to a charge to point out distinctly the objectionable matter and the grounds for the objection. TEX.R. CIV. P. 274. Rule 278 requires that a requested instruction, definition, or ques-

---

3. *Belo* involved a libel suit against a corporation and its stockholders. The court held that if a corporation, by its wrongful acts, injures an individual, it is liable and those who aid and assist in the wrongful act are equally responsible. *Belo v. Fuller*, 84 Tex. 450, 19 S.W. 616, 617 (1892). This case did not discuss how the issues should be presented to the jury.

tion be tendered in writing and in substantially correct form prior to submission of the charge to the jury. TEX.R. CIV. P. 278. Where the requested question is relied on by the requesting party, an objection and a written request for submission in substantially correct form is required to preserve error. *J & C Drilling Co. v. Salaiz,* 866 S.W.2d 632, 636 (Tex.App.—San Antonio 1993, no writ); *Wright Way Constr. Co. v. Harlingen Mall Co.,* 799 S.W.2d 415, 419 (Tex.App.—Corpus Christi 1990, writ denied).

In order to be entitled to judgment for joint and several liability, Bentley was required to secure a jury finding on the amount of damages he suffered as a result of the conspiracy itself. *See Belz,* 667 S.W.2d at 243. The conspiracy did not commence until Gates began his participation in the program, that is, after July 11, 1995. The damages found by the jury against Bunton were not appropriate as against Gates because many of the defamatory acts occurred prior to Gates's involvement in the Q & A program. Bentley asserts that Gates ratified Bunton's conduct prior to the conspiracy. There is no evidence that Gates ratified any of Bunton's conduct occurring prior to his participation in the presentations. There is no evidence that he knew what Bunton had said at any time prior to July 11 or that he intended to give validity to Bunton's earlier acts as required for a ratification. *See Motel Enters., Inc. v. Nobani,* 784 S.W.2d 545, 547 (Tex.App.—Houston [1st Dist.] 1990, no writ) (on reh'g). Therefore, a damage finding related to the conspiracy to defame was required.

■ Bentley raised the issue of joint and several liability at the charge conference, and properly objected to some questions because they did "not take into account the joint and several liability rule." Our record, however, does not include Bentley's requested questions for the jury. The record before us does not show that Bentley requested a damage question on the conspiracy issue in substantially correct form. Accordingly, while the unchallenged finding of civil conspiracy stands, Bentley has waived his complaint that the trial court erred in not imposing joint and several liability on Bunton and Gates. *See Fairfield Estates L.P. v. Griffin,* 986 S.W.2d 719, 724 (Tex.App.—Eastland 1999, no writ) (where record did not contain written request, complaint was waived); *Hart,* 952 S.W.2d at 94 (where record shows no objection or request of appropriate instructions and questions, any error is waived); *Connors v. Connors,* 796 S.W.2d 233, 236 (Tex.App.—Fort Worth 1990, writ denied) (appellant's complaint without merit where the record contains no requested questions or instructions). We overrule Bentley's cross-point.

### GATES'S EXEMPLARY DAMAGES

■ In his third issue, among numerous other arguments, Gates asserts that, because there is no basis for awarding actual damages against him, the award of exemplary damages is improper. We agree.

Exemplary damages are not recoverable absent an award of actual damages. *Nabours v. Longview Savs. & Loan Ass'n,* 700 S.W.2d 901, 904 (Tex.1985). In the absence of a finding of damages suffered as a result of the conspiracy, Gates cannot be held liable for the damages caused by the publication of Bunton's defamatory statements. Therefore, Bentley cannot recover exemplary damages from Gates. To the extent addressed, we sustain Gates's third issue. We need not reach Gate's remaining arguments under this issue. *See* TEX. R.APP. P. 47.1.

### Conclusion

We affirm the trial court's judgment as to Bunton's liability for defamation. Accordingly, we affirm that portion of the trial court's judgment ordering Bunton to pay $7,150,000 in actual damages. We affirm that portion of the trial court's judgment ordering Bunton to pay $1,000,000 in exemplary damages; Bunton makes no complaint of that portion of the judgment on appeal. We reverse the portion of the judgment allowing Bentley to recover actual and exemplary damages from Gates and render judgment that Bentley take nothing on his cause of action against Gates.