**Affirmed and Opinion and Concurring Opinion filed April 30, 2013.**



In The

# Fourteenth Court of Appeals

### NO. 14-12-00015-CV

### MANZOOR MEMON, Appellant

### V.

### HAROON SHAIKH, Appellee

**On Appeal from the 55th District Court
Harris County, Texas
Trial Court Cause No. 2010-28636**

## O P I N I O N

The defendant in this defamation case asks us to reverse the judgment and remand the case for a new trial. He argues that this result is required because the jury's answer to the single actual-damages question was predicated on its findings that he published nine defamatory statements that he knew or should have known were false, but the evidence is legally insufficient that one of the statements was false. He also asserts that the damages awarded are excessive and asks that we

suggest remittitur reducing the actual-damages award from $350,002 to $20,000 and the exemplary-damages award from $350,000 to $5,000. Finally, he contends that the trial court erred in permanently enjoining him from publishing the same statements on which the jury based its liability findings, and argues that the findings necessary to support the injunction are contrary to those actually found by the jury.

We conclude that, with regard to the appellant's challenge to the legal sufficiency of evidence to support certain of the jury's findings concerning one of the nine statements at issue, any error is harmless because the statements were different factual bases for a single theory of liability rather than different liability theories. Additionally, even if each statement could be a separate liability theory, then the appellant failed to preserve his appellate arguments by objecting to the charge at trial. We further conclude that the evidence is factually sufficient to support the challenged findings, and that the permanent injunction is not inconsistent with the jury's findings. We accordingly affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Haroon Shaikh is an accountant who is active in a variety of civic, religious, and cultural organizations serving the Houston area generally and the Islamic and Pakistani communities in particular. Several years ago, Manzoor Memon began publishing a variety of defamatory statements about Shaikh in letters, blogs, emails, and a monthly newsletter. In Shaikh's ensuing defamation suit against Memon, evidence of the facts recounted below was produced.

Until 2008 or 2010, Shaikh owned several video stores that stocked both adult and mainstream movies.[1] He testified that he obtained legal opinions in

---

[1] The evidence concerning this date is conflicting.

2

August 2003 and again in August 2009 that the stores could be operated without a license from the city to operate a sexually-oriented business. Shaikh further testified that he did not promote the stores as "adult stores" or advertise them as adult video stores; that he did not ask anyone else to do so; and that he did not promote pornography. He has never been cited for operating a sexually-oriented business without a license.

On April 15, 2009, Memon wrote to the president of the Islamic Society of Greater Houston ("ISGH") urging him to stop employing Shaikh's accounting firm. In the letter, Memon wrote that "recent government documents still show that Mr. Haroon Shaikh is President and CEO of a chain of Adult Book store[s] promoting pornography" and urging the organization to "terminate [its] relationship with a company whose owner is working against all Islamic values." Memon further stated, "[M]y suggestion would be to take action without any publicity before this matter leaks to main stream media." There is no evidence of any such government documents, and no evidence that Shaikh was an officer in a chain of adult bookstores.

On June 22, 2009, Memon wrote to the directors of ISGH and fourteen branches of the organization suggesting that the organization's president was "supporting Haroon Shaikh and condoning what he does[,] indirectly supporting pornography."

The next day, Memon wrote to the mayor of Houston complaining about Shaikh's appointment to the Mayor's Advisory Board for International Affairs and to the Harris County-Houston Sports Authority ("Sports Authority"). According to Memon, Shaikh was the "owner of multiple outlets of sexually[-]oriented businesses" and had been appointed to the Sports Authority's board without proper investigation based on his financial contributions or the recommendations of the

3

mayor's supporters rather than on the basis of "ethics, moral character and community service." Memon sent copies of the letter to the chairpersons of both boards and to "[a]ll media outlets." Shaikh resigned from the Sports Authority on August 13, 2009. Two days later, an article appeared in the *Houston Chronicle* concerning the same allegations made by Memon, and including statements from Memon. The article provided in pertinent part as follows:

> A prominent local businessman and generous City Hall campaign donor has resigned his post on the [Sports Authority] board amid questions about his ownership of several adult video stores.
>
> . . .
>
> The stores . . . did not operate with sexually[-]oriented business permits, and are close to . . . churches, schools, day care centers, residential neighborhoods or apartment complexes. City ordinance prohibits such businesses, referred to as SOBs, from operating within 1,500 feet of such areas.
>
> . . .
>
> "We didn't know it was an SOB," Shaikh said. "The intention was never to run a sexually[-]oriented business. They're closed now. We lost quite a bit of money and 14 people lost their jobs as of today."
>
> . . .
>
> [The assistant police chief stated that the] stores had never been targeted by police for SOB enforcement because they were not identified as "an extreme violator of vice laws."
>
> . . .
>
> Shaikh said he sold the businesses to his brother in July 2008, months before he was even considered for appointment to the [S]ports [A]uthority board. In the decade he owned the stores, he had operated under the assumption—made after consulting his attorney—that they did not meet the legal definition of a sexually[-]oriented businesses [sic] because 60 to 70 percent of their revenue was from the sale of mainstream feature films.
>
> On Monday, the store at 10855 Telephone, for one, appeared to have far more adult titles for sale than mainstream films.

4

. . .

Legal experts said state statute and case law associated with sexually[-]oriented businesses have defined "primary business" as "not incidental" to a company's revenue and have stipulated that if the main draw of a business involves the sale of sexual images, it qualifies as its "primary business."

. . .

Manzoor Memon . . . said Shaikh's appointment was inappropriate given his ownership of the video stores.

"This makes it appear as though everything is for sale," said Memon, who noted Shaikh's campaign contributions. "The people who have big money go out and buy these positions."

. . .

[City council member M.J.] Khan said he was not aware "of the nature of those businesses" when he suggested the appointment [of Shaikh to the board of the Sports Authority].

. . .

Shaikh said he decided to resign from the [S]ports [A]uthority board, effective Thursday, when questions were raised about the stores, even though he no longer owns them.

Shaikh testified at trial that when the article appeared, officers from the Houston Police Department's vice division came to one of the video stores, determined that it was "still in compliance" with the law, and confirmed that no license to operate the store as a sexually-oriented business was required.

Four days after the article appeared, Memon sent a mass email to hundreds of people, stating, "On behalf of [the] Muslim and Pakistani community I demand [the] resignation of Mr. Haroon Shaikh from representing [the] following main stream organizations due to his involvement in promoting pornography close to neighborhoods, religious and educational institutions in the City of Houston city limit." Memon called for Shaikh to resign as chairman of the Houston-Karachi Sister City Commission and as the financial advisor and accountant to the ISGH,

5

the Pakistani American Society of Greater Houston, and the Pakistan Chamber of Commerce-USA. He stated that "[b]efore [the] Houston Chronicle runs more stories about Mr. Haroon Shaikh we must clean our community organizations and eliminate people with criminal records to show case that we practice what we preach." At trial, however, Memon acknowledged that he knows Shaikh does not have a criminal record.

On September 28, 2009, Memon again sent a mass email in which he stated that after the *Chronicle*'s article about "Shaikh's immoral and un-Islamic activities Houston Christians showed their character and fired him from [the] Sports Authority and many other boards . . . ." It is undisputed, however, that Shaikh resigned from the Sports Authority before the newspaper article appeared, and that his resignation was discussed in the article. He did not resign from any other boards, and there is no evidence that he was involuntarily terminated from any position at any time.

On the same day, one of the email's recipients sent a reply to Memon stating, "Haroon Shaikh should be in jail." According to Shaikh's testimony at trial, Memon forwarded this reply email to 500 people.

In January 2010, Memon published his own newspaper again reporting that Shaikh had been "forced to resign from Harris County Sports Authority [and] Karachi Houston Sister City Boards." He made the same statements in April 2010, and additionally reported that another man, G.B.,[2] "used services of pornography kingpin Haroon Sheikh [sic] . . . to buy foreclosed assets . . . ." Memon asserted that G.B. and Shaikh "have been successful in defrauding many financial institutions." At trial, Shaikh testified without contradiction that he did not buy the

---

[2] This person also has sued Memon for defamation. Because he is not a part of this action, we have identified him using initials.

assets described. In a separate article in the same issue, Memon referred to "Condemned Promoter of pornography Haroon [Shaikh]."

In the June 2010 issue of his newspaper, Memon stated that Shaikh engaged in "financial frauds and unethical business activities" and that Shaikh, whom Memon again described as a "pornography kingpin," was one of several people who had filed a series of lawsuits "to harass Memon and his family."[3]

On June 29, 2010, Memon sent another mass email stating that Shaikh "was busted by Houston [C]hronicle and Houston Police Dept Vice squad for running those porno shops without obtaining SOB (Sexually[-]Oriented Business) licenses. All his stores were shut and Haroon was fired from [the Sports Authority] directorship . . . ."

In the July and August 2010 issues of his paper, Memon placed a front-page ad in which he described Shaikh and a former member of the Houston City Council as "covermen for buying assets of bankcrupt [sic] businessman [G.B.]," and stated that he was "looking for eye witnesses who saw this criminal activity." Shaikh's trial testimony that he did not buy such assets was uncontroverted.

On August 19, 2010, Memon wrote to Houston's mayor complaining of Shaikh's membership on the City's Affirmative Action Contract Compliance Commission and again stated that Shaikh had been "removed" from the board of the Sports Authority.

In January 2011, Memon wrote to the Criminal Investigation Division of the Internal Revenue Service to convey "critical documents and clues about [G.B.] and his very close associates which could possibly lead to you uncovering the biggest financial frauds and crimes within the South Asian community in decades." One

---

[3] Shaikh filed this suit in May 2010.

such "critical document" was Memon's list of sixteen people he claims are involved in hiding assets "swindled from financial institutions." The first name on the list is that of Haroon Shaikh. Memon referred to the listed individuals as "white[-]collar criminals" and asserted that "this is a Pakistani Mafia operating in close circle helping each other and defrauding innocent investors, financial and mortgage institutions and even [the] US treasury." Shaikh testified at trial that such allegations about him were false.

On March 28, 2011, Memon wrote a letter to a federal judge in which Memon identified Shaikh as a member of a "financial fraud Mafia" that was "very active in [the] Houston area defrauding American financial institutions."

In the August 2011 issue of his newspaper, Memon wrote a column listing the paper's accomplishments under the heading "Mission Accomplished." In all capital letters, Memon wrote "Haroon Shaikh forced to leave Harris County Sports Authority and gives up his presidency of Houston Karachi Sister City Commission and Chairmanship of Pakistan Chamber of Commerce USA."[4]

Memon represented himself during the trial and made no objection to the jury charge, which focused on the following nine specific statements allegedly published by Memon:

A.    Haroon Shaikh was fired, forced to resign, or asked to resign from the Harris County Sports Authority;

B.    Haroon Shaikh was fired, forced to resign, or asked to resign from the Houston-Karachi Sister City Commission and many other boards;

C.    Haroon Shaikh is a member of the Pakistani Mafia;

---

[4] This is not a complete list of Memon's statements about Shaikh, which, according to Shaikh, began in 2005 or 2006. Memon dates his campaign from April 2009. As Memon testified, "This is April of 2009. . . . That's when I started the campaign. . . . I wanted to give him his own medicine because he was responsible for all the mental anguish I have."

D.   Haroon Shaikh is a criminal or has violated criminal laws;

E.   Haroon Shaikh purchased bankrupt companies of [G.B.] to defraud creditors, banks and mortgage companies;

F.   Haroon Shaikh participated in a fraudulent scheme to purchase assets of bankrupt companies with [G.B.] or any other person;

G.   Haroon Shaikh purchased the assets of any business owned by [G.B.] out of bankruptcy or in any other manner that defrauded, cheated, mislead or confused any creditor, lender, or governmental agency;

H.   Haroon Shaikh owns or owned video stores that were required to have a Sexually[-]Oriented Business license from the City of Houston; and/or

I.   Haroon Shaikh is a pornography king, pornography kingpin or a condemned pornography kingpin.

As to each statement, the jury was asked to determine whether (a) Memon published the statement; (b) the statement was defamatory; (c) the statement was false; and (d) Memon knew or should have known, in the exercise of ordinary care, that the statement was false and potentially defamatory.  If, as to at least one of the nine statements, the jury answered each of these questions in the affirmative, then the jury was asked to state separately the amounts that would fairly and reasonably compensate Shaikh for past mental anguish, future mental anguish, past damage to his reputation, and future damage to his reputation.[5]  The jury gave affirmative answers to each question regarding every statement, and assessed damages of $100,000 for past mental anguish, $1 for future mental anguish, $250,000 for past damage to Shaikh's reputation, and $1 for future damage to his reputation.  The

_____

[5] This question was phrased, "What sum of money, if paid now in cash, would fairly and reasonably compensate Haroon Shaikh for his actual pecuniary loss, if any, that was proximately caused by any of the false defamatory statements you have found were made by Manzoor Memon?"  In answering the question, the jury was instructed to consider only past and future mental anguish and past and future damage to reputation, and Memon does not contend that these are not types of "actual pecuniary loss," or otherwise address the inclusion of this phrase in the jury charge.

9

jury also found, by clear and convincing evidence, that the harm to Shaikh resulted from malice and also from gross negligence. The jury assessed exemplary damages of $350,000.

The trial court rendered judgment in accordance with the verdict. In its judgment, the trial court additionally provided as follows:

> It is further ORDERED, ADJUDGED AND DECREED that the jury's verdict and the court record reflect the Defendant has engaged in wrongful conduct that has continued up to trial and will likely continue after the entry of this Judgment; the continued imminent irreparable harm the Plaintiff is likely to suffer as a consequence of the Defendant's wrongful conduct justifies the imposition of a permanent injunction against the Defendant; and, accordingly, the Defendant Manzoor Memon is commanded forthwith to immediately and permanently desist and refrain from writing, publishing, republishing, circulating, broadcasting, or communicating any of the following defamatory statements or comments concerning the Plaintiff, HAROON SHAIKH . . . .

This was followed by a list of the same nine statements described in the jury charge. The judgment continued as follows:

> This permanent commandment applies to all websites, blogs, emails, broadcasts, blasts, text messages, tweets, memoranda, radio transmissions, television transmissions, faxes, flyers, newsletters, newspapers, memoranda, correspondence, books, e-books, or other written communications of any type; and it further requires the Defendant to remove all web pages, web postings, archives, prior publications, or other items on any website under the direct or indirect control of the Defendant containing any of these defamatory statements or comments from the internet[.] This commandment specifically prohibits the defendant from republishing any of the foregoing defamatory statements or comments in any way form or fashion on or after the date this Judgment is signed.

Memon retained counsel after the jury returned its verdict, and acting through counsel, he timely filed a motion for new trial, a motion to modify the

10

judgment to delete the permanent injunction, and a motion for judgment notwithstanding the verdict.[6]  These motions were overruled by operation of law, and Memon perfected his appeal.[7]

## II. ANALYSIS

### A.     Legal Sufficiency of the Liability Findings

In his first issue, Memon argues that the trial court erred in denying his motion for judgment notwithstanding the verdict and his motion for new trial. Judgment without or against a jury verdict is proper at any course of the proceedings only when the law does not permit reasonable jurors to reach a different result.  *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005).  A trial court may render judgment notwithstanding the verdict if a directed verdict would have been proper, or if no evidence supports the trial court's findings.  TEX. R. CIV. P. 301.  Stated differently, judgment notwithstanding the verdict is proper if the evidence is legally insufficient to support the verdict.  The test for legal sufficiency accordingly is the same for judgments notwithstanding the verdict, directed verdicts, and appellate no-evidence review.  *City of Keller*, 168 S.W.3d at 823.

When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it.  *See id.* at 827.  We credit favorable evidence if a reasonable juror could and disregard contrary evidence unless a reasonable juror could not.  *Id.*  If the evidence at trial would enable reasonable and fair-minded

---

[6] Memon also filed an untimely supplemental motion for new trial, but concedes that this motion could preserve no new grounds for review.

[7] After the motions were overruled by operation of law but before the trial court's plenary jurisdiction expired, the trial court signed an order denying Memon's post-trial motions, except that the court upheld a legal-sufficiency challenge to the evidence of past and future damage to Shaikh's reputation and directed the parties to submit a modified judgment.  A week later, however, the trial court vacated this order and again denied Memon's post-trial motions.

11

people to find the facts at issue, then the evidence is legally sufficient. *Id.* Because jurors are the sole judges of witness credibility and the weight to give to testimony, we cannot substitute our opinion for that of the jury. *See id.* at 819.

A trial court has "considerable discretion" to set aside a jury verdict. *In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 211 (Tex. 2009) (orig. proceeding). Thus, we generally apply the abuse-of-discretion standard when reviewing the trial court's ruling on a motion for new trial. *Mindis Metals, Inc,. v. Oilfield Motor & Control, Inc.*, 132 S.W.3d 477, 485 (Tex. App.— Houston [14th Dist.] 2004, pet. denied). If the motion for new trial is based on a challenge to the sufficiency of the evidence supporting the verdict, then we review the trial court's denial of the motion by applying the standard of review that corresponds to the sufficiency challenge. *Enright v. Goodman Distribution, Inc.*, 330 S.W.3d 392, 396 (Tex. App.—Houston [14th Dist.] 2010, no pet.). In this case, then, the same legal-sufficiency standard of review applies to the trial court's denial of Memon's motion for judgment notwithstanding the verdict and to its denial of his motion for new trial.

Here, Memon argues that the trial court erred in denying these motions because "the evidence was legally insufficient to support the jury's findings on some of the liability questions and a single question was submitted on each element of damages." Specifically, he contends there is no evidence that statement H ("Haroon Shaikh owns or owned video stores that were required to have a Sexually[-]Oriented Business license from the City of Houston") was false, or that Memon knew or should have known that this statement was false. Thus, he asserts that the evidence is legally insufficient to support the jury's affirmative answers to questions 3(H) and 4(H). He contends that the legal insufficiency of the evidence to support the jury's answers to these subparts of the liability questions was

12

harmful error because the jury was asked to determine the total amount of each element of damages caused by all of the statements on which the liability findings were based. He asserts that because the jury was asked to state only the cumulative amount of each element of damages caused by all nine statements, he is unable to properly present his case on appeal. According to Memon, there is no way to determine what portion of the damages were awarded for a particular statement, and thus, we cannot determine whether the jury based its assessment of damages on a "valid liability theory."

This argument is based on the assumption that each statement listed in the charge constituted a separate liability theory, at least one of which was invalid *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 389 (Tex. 2000). When a plaintiff alleges that multiple instances of the same kinds of acts committed by the same defendant result in liability for the same cause of action, it is an open question as to whether the acts constitute multiple theories of liability or simply multiple factual allegations supporting a single theory of liability. We conclude that on the facts of this case, in which each factual allegation required proof of the same elements and resulted in the same injuries, only one theory of liability was presented. *See Formosa Plastics Corp., USA v. Kajima Int'l, Inc.*, 216 S.W.3d 436, 455 & n.5 (Tex. App.—Corpus Christi 2006, pet. denied) (op. on reh'g en banc) (plaintiff construction company's claim that it was damaged by defendant's fraudulent conduct in the contract-bidding process and its fraudulent inducement of extra-contractual work constituted a single theory of liability—fraud—even though acts alleged concerned five different contracts); *Columbia Med. Ctr. of Las Colinas v. Bush ex rel. Bush*, 122 S.W.3d 835, 858 (Tex. App.—Fort Worth 2003, pet. denied) (where negligence is the only theory of liability, specific acts of negligence are not separate theories of liability) (cited with approval in *Columbia Rio Grande*

13

*Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 864 (Tex. 2009)).

Even if, as Memon contends, each factual basis for Shaikh's defamation claim was an independent theory of liability and the submission of the single damage question under these circumstances prevents a determination that the damage finding is based on a "valid liability theory," then Memon was required to preserve this argument with a timely and specific objection to the charge. *See, e.g.*, *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 228–30 (Tex. 2005) (error was preserved by an objection that a single apportionment question required the jury to consider a liability theory for which there was no evidence); *Harris County v. Smith*, 96 S.W.3d 230, 231–32 (Tex. 2002) (County preserved error by objecting to broad-form submission of damage question that included elements for which there was no evidence). Here, however, Memon failed to object to the damage question. Moreover, he argues that predicating a single question asking for the total for each element of damages caused by all of the statements at issue was not erroneous because the jury would have had no basis on which to allocate damages among the various statements. But in making this argument, Memon has assumed that if additional damage questions were not required, then no objection was required to preserve for appeal his arguments regarding the single damage question. This is incorrect. *Cf. Tex. Com'n on Human Rights v. Morrison*, 381 S.W.3d 533, 536 (Tex. 2012) (per curiam) ("We require only objections, not correct questions, to preserve *Casteel* error."); *Romero*, 166 S.W.3d at 229 (appellant was not required to request multiple apportionment questions; it was sufficient that appellant objected to the inclusion of an invalid theory of liability in the single apportionment question).

In sum, we conclude that if the evidence was legally insufficient to support the submission of questions 3(H) and 4(H), any error was harmless, because each

14

statement is simply a different factual allegation supporting a single theory of liability. Moreover, even if this is incorrect and each statement constitutes a separate liability theory, then Memon failed to preserve his appellate arguments with a timely objection to the charge. We therefore overrule Memon's first issue.

## B. Factual Sufficiency of the Damage Awards

In his second issue, Memon contends that the trial court erred in denying his motion for new trial because the evidence is factually insufficient to support the jury's award of actual and exemplary damages. He asks that we suggest remittitur to reduce the total amount of actual damages to $20,000 and the exemplary damages to $5,000.

We analyze a complaint of excessive damages using the same standard of review applicable to other factual-sufficiency challenges. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998) (citing *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986)). We consider and weigh all of the evidence, and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* at 407.

### 1. Mental-Anguish Damages

To be compensable, mental anguish must consist of "'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment or anger'" and which instead may substantially disrupt the plaintiff's daily routine. *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995) (addressing legal sufficiency of mental-anguish evidence and quoting *J.B. Custom Design & Bldg. v. Clawson*, 794 S.W.2d 38, 43 (Tex. App.—Houston [1st Dist.] 1990, no writ)). In his only argument for the factual insufficiency of the evidence supporting the amount of the mental-anguish damages found by the jury,

15

Memon argues that "any mental[-]anguish damages suffered by Shaikh were necessarily many times greater for the statements made in [the] *Chronicle* article than for those made in Memon's writings" because "the *Chronicle* is a far more credible publication, with a much greater print and online circulation, and the statements in the *Chronicle* article were much better articulated and substantiated than any of Memon's complained-of writings." In conducting our factual-sufficiency review, however, we may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence clearly would support a different result. *Id.* (citing *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex. 1986) (op. on reh'g)). Given the evidence presented at trial, the jury additionally was entitled to conclude that the *Chronicle* article appeared in response to Memon's letter. Moreover, the article appeared *after* Shaikh resigned from the Sports Authority, accurately reported that Memon already had resigned, and correctly represented that no citations had ever been issued for operating the stores without an enterprise license from the City of Houston.

In contrast, Memon made false statements of a more serious nature about Shaikh, and did so for years. We have found no other case in which an individual has singled out a person who is not a public figure[8] to be the target of so many defamatory statements over such an extended period of time. The closest case we have found concerns statements made over many months about a public official. Because the extended litigation in the case of *Bentley v. Bunton* resulted in five appellate opinions, we denote the opinions chronologically as *Bentley I* through *Bentley V*. *See Bunton v. Bentley*, 176 S.W.3d 1 (Tex. App.—Tyler 1999, pet. granted) ("*Bentley I*"), *aff'd in part, rev'd and remanded in part*, 94 S.W.3d 561

---

[8] In issuing the temporary injunction in this case, the trial court found that Shaikh is not a public figure. Although Memon asserted in his motion for new trial that Shaikh is a limited purpose public figure as a matter of law, he has not reurged the argument on appeal.

16

(Tex. 2002) ("*Bentley II*"); *on remand*, 176 S.W.3d 18 (Tex. App.—Tyler 2003, pet. granted) ("*Bentley III*"), *aff'd in part, rev'd in part, and remanded*, 153 S.W.3d 50 (Tex. 2004) (per curiam) ("*Bentley IV*"); *on remand*, 176 S.W.3d 21 (Tex. App.—Tyler 2005, pet. denied) ("*Bentley V*").

In *Bentley*, Bunton, the host of a local weekly television show, repeatedly criticized a district judge over a period of approximately 18 months. *Bentley I*, 176 S.W.3d at 6–7, 14. He stated on numerous occasions that Judge Bentley was "corrupt," and on one occasion, called the judge "criminal." *Id.* at 6–7. The jury rejected Bunton's contentions that these claims were true, and instead concluded, based on legally and factually sufficient evidence, that Bunton made the defamatory remarks knowing that they were false or with reckless disregard of their truth or falsity. *Id.* at 8–11. The jury assessed damages against Bunton of $150,000 for past and future damage to Judge Bentley's character and reputation and damages of $7 million for past mental anguish. *Id.* at 12. The Texas Supreme court agreed that the award for damage to the judge's reputation was "well within a range that the evidence supports," but reversed and remanded for the appellate court to reconsider the amount of damages awarded for mental anguish. *Bentley II*, 94 S.W.3d at 607.

On remand, the intermediate appellate court described the evidence of mental anguish admitted at trial. Judge Bentley testified that he was "unable to tend to his family obligations because he was sulking and worrying" and that the defamation "affected his family's ability to enjoy each other." *Bentley III*, 176 S.W.3d at 20. Mrs. Bentley testified that Bunton's actions "ruined her husband's life and her children's lives" and caused her husband to lose sleep, and she stated that his life would never be the same. *Id.* Other friends stated that the case made Bentley "downcast, sad, and depressed" and that "the slander had a severe effect

17

on Bentley and his family." *Id.* The appellate court suggested remittitur reducing the mental-anguish damages to $150,000, *id.* at 21, and Bentley timely filed the remittitur. *Bentley V*, 176 S.W.3d at 23. The Texas Supreme Court agreed that sufficient evidence supported an award of $150,000 for mental-anguish damages. *Bentley IV*, 153 S.W.3d at 53.

Here, the jury found that $100,000 would fairly and reasonably compensate Shaikh for past mental anguish, and the evidence supports the award. The plaintiff was the target of Memon's attacks for more than 27 months, as compared to 18 months in *Bentley*. M.J. Khan testified that he had seen "how disturbed [Shaikh] had been for . . . over a year *or maybe two* since these things came about." (emphasis added). According to Khan, Shaikh was "very disturbed that his name is being maliciously maligned by these kind of false accusations."

Shaikh's own testimony was much more detailed. He stated that the emotional strain from Memon's prolonged attacks was "beyond the imagination," and he described how Memon had hurt Shaikh's family and damaged his health:

> When he started [his] attack on me, my daughter was eleven years old.
>
> She is now 13. She needed me and I am not available to her. . . . And she asked me what is wrong with you Papa? And I am just going, coming from work and going to my bedroom. Couldn't talk, couldn't speak, because of that man.
>
> This is more than a murder. He should have killed me, if he did not like me; not tortured me like this in front of my colleagues, in front of my friends, in front of my associate[s], my employees, my directors, bank association.
>
> All my life I have done nothing but charitable work and help communities and help out and provided whatever I could. You know, I don't want to talk about this. My donations are at least 30 percent of what I make. I give it to charity. This is my heart. This is what it is.
>
> But this man, with animosity, with jealousy, with whatever, it

just ruined my life for two years. I cannot -- I am shaking. Even now I am shaking. . . .

I need to go home to sleep without taking pills. I need my health back. I am -- I have high blood pressure now, taking blood pressure medicine. I have diabetes now.

If Mr. Memon wants to know he hurted me? Yes, he did. Bad time. Big time. He hurted my family. Big time. He hurted my daughter, she cries with me. My wife, she cries with me.

The most famous name in our household is Manzoor Memon. What did he do to you today? Why are you so upset, Papa.

I cannot talk. I could not help her with the homework. This was too bad. I'm sorry. (Crying)

On this record, we conclude that the evidence supports the assessment of $100,000 for past mental anguish as reasonable compensation for the substantial disruption in Shaikh's daily routine and his high degree of mental pain and distress. *See Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). Thus, we overrule Memon's challenge to the factual sufficiency of the evidence to support the amount awarded.

### 2. *Damage to Reputation*

Memon argues that "Shaikh's purported evidence for damage to reputation was instead largely for business disparagement," and argues that Shaikh did not offer sufficient evidence to support an award for business disparagement. This argument is without merit. Shaikh sued Memon for defaming him personally and damaging his personal reputation, and as discussed further *infra*, Shaikh offered evidence supporting the damages awarded.

Memon additionally contends that "if Shaikh suffered any such significant damage to his reputation, the overwhelming majority would have already been caused by the *Chronicle* article rather than Memon's writings, which almost all came after it." Although the *Chronicle* article implied that the video stores were

19

required to be licensed by the City, almost none of the remaining statements published by Memon were suggested by the article.

Memon also states that "in theory, for a written statement to damage a person's reputation, it must have actually been read by someone who knew the person well enough to have an opinion about him (or at least remember reading a statement about him), believed the statement, and lowered their opinion of the person as a result of reading and believing the statement." He says there is no evidence of the number of people who read the statements, and no evidence that a reasonable person who had a neutral or favorable opinion of Shaikh would have found Memon's statements credible or lowered his or her opinion of Shaikh as a result of reading the statements. Although Memon cites no authority in support of this argument, jurors could infer from the evidence presented that Memon's statements had a negative effect on Shaikh's reputation. *See Olson v. Westergren*, No. 13-10-00054-CV, 2011 WL 3631963 at *5–6 (Tex. App.—Corpus Christi Aug. 18, 2011, pet. denied) (mem. op.) (affirming award of $20,000 for damage to reputation despite "substantial evidence" of the plaintiff's "positive and distinguished reputation in the community" and evidence that a coworker "couldn't believe" the allegations, because the statements made on the radio imputed sexual misconduct and thus were defamatory per se).

M.J. Khan testified in a general way concerning the effect of Memon's statements. Khan was asked, "Have these statements harmed his reputation in the community?" He answered, "Yes, I would think so, yes." Although Khan testified that Shaikh is a very close friend and that in the absence of proof, Khan would not believe the negative things said about Shaikh, it is telling that Khan returned contributions that Shaikh made to Khan's political campaigns.

The record also contains more explicit evidence. Memon sent emails to

20

hundreds of Pakistani Muslims in the area, and demanded Shaikh's resignation from his various positions with Houston Pakistani or Islamic organizations "due to his involvement in promoting pornography close to neighborhoods, religious and educational institutions in the City of Houston city limit." He stated, "Before [the] Houston Chronicle runs more stories about Mr. Haroon Shaikh we must clean our community organizations and eliminate people with criminal records to show case that we practice what we preach." A recipient of Memon's multiple mass emails (and whom Shaikh testified that he does not know) responded, "Haroon Shaikh should be in jail." This is some evidence that a reasonable person would have a lowered opinion of Shaikh based on Memon's statements implying that he had a criminal record of promoting pornography.

Memon further argues that the damages cannot be presumed to have been caused by his statements because at least four of the nine statements upon which the jury based its liability findings were not defamatory per se. Statements that are defamatory per se are presumed to injure the plaintiff's reputation, but if the defamatory statement is only defamatory *per quod*, the plaintiff must prove the existence and amount of damages. *Bentley II*, 94 S.W.3d at 604.

Under the common law, a statement is defamatory per se only if it falls within one of the following categories: (1) imputation of a crime; (2) imputation of a loathsome disease; (3) injury to a person's office, business, profession, or calling; or (4) imputation of sexual misconduct. *See Gray v. HEB Food Store No. 4*, 941 S.W.2d 327, 329 (Tex. App.—Corpus Christi 1997, writ denied). By statute, a written statement also is defamatory per se if it is one that

> tends to blacken the memory of the dead or that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the

21

natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury.

TEX. CIV. PRAC. & REM. CODE ANN. § 73.001 (West 2011). "If the court must resort to innuendo or extrinsic evidence to determine that the statement was defamatory, then it is libel per quod and requires proof of injury and damages." *Main v. Royall*, 348 S.W.3d 381, 390 (Tex. App.—Dallas 2011, no pet.).

Memon contends that the following statements are not defamatory per se:

A. Haroon Shaikh was fired, forced to resign, or asked to resign from the Harris County Sports Authority.

B. Haroon Shaikh was fired, forced to resign, or asked to resign from the Houston-Karachi Sister City Commission and many other boards;

H. Haroon Shaikh owns or owned video stores that were required to have a Sexually[-]Oriented Business License from the City of Houston; and/or

I. Haroon Shaikh is a pornography king, pornography kingpin, or a condemned pornography kingpin.

Although Memon contends that these statements are not defamatory per se,[9] the distinction between statements that are defamatory per se and those that are defamatory *per quod* makes little difference here, because the jury's assessment of

---

[9] Memon additionally argues that Statement "I" is not defamatory at all; however, a reader reasonably could understand Memon's statement that Shaikh is a "condemned pornography kingpin" to mean that Shaikh was convicted of a crime. *See* WEBSTER'S NEW WORLD COLLEGE DICTIONARY 289 (3d ed. 1996) (definitions of "condemn" include "to declare to be guilty of wrongdoing; convict" and "to pass judicial sentence on"). *See also Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000) ("[A] publication can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory."). This interpretation could have been reinforced by (1) Memon's email referring to Shaikh's alleged "involvement in promoting pornography" and stating that "we must clean our community organizations and eliminate people with criminal records"; and (2) Memon's separate email asserting that Shaikh "was busted by [the] Houston [C]hronicle and Houston Police Dept Vice squad for running those porno shops without obtaining SOB (Sexually[-]Oriented Business) licenses."

damages does not rest solely on a presumption of harm.[10]  Shaikh introduced evidence that supports the actual damages assessed by the jury and awarded by the trial court.  The award of $250,000 for past damage to reputation does not exceed the amount supported by the evidence.

Unlike the case in *Bentley*, in which the defendants published their statements on television so that the audience for their statements had to seek them out, Memon selected his audience to include governmental agents, a federal judge, and members of organizations for whom Shaikh worked or in which he held leadership positions.  Moreover, one of the recipients of Memon's repeated mass emails responded that Shaikh "should be in jail," and a close friend who has known Shaikh for years returned Shaikh's campaign contributions.  As previously noted, Memon has engaged in a campaign of letter-writing, mass emailing, and personal meetings to defame Shaikh, and the campaign has lasted for years.  Considering the sheer number of defamatory statements and the wide audience to which Memon published them over a period of more than two years, we are confident that the evidence supports the damages awarded.  *See, e.g.*, *Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 310, 330 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (affirming award of $100,000 for damage to reputation based on statements to plaintiff's professional colleagues that plaintiff, who had been appointed to the board of the local transit authority, was "dishonest and unethical in the conduct of his business and political affairs"); *Peshak v. Greer*, 13 S.W.3d 421, 423–24, 427 (Tex. App.—Corpus Christi 2000, no pet.) (affirming award of $55,000 for past

---

[10] Memon's statements have escalated from assertions that Shaikh owned video stores that offered material for sale that is forbidden in certain religions to representations to a federal judge and the Criminal Investigation Division of the Internal Revenue Service that Shaikh is a member of a "financial fraud Mafia."  Although the former statements are not necessarily defamatory, because "it is not defamatory to accuse a person of doing that which he has a legal right to do," *Means v. ABCABCO, Inc.*, 315 S.W.3d 209, 214 (Tex. App.—Austin 2010, no pet.), statements such as the latter plainly are defamatory per se.

and future injury to reputation based on one letter to the Federal Aviation Administration and a second letter to police accusing plaintiff aircraft inspector of breaking into his airplane); *Bolling v. Baker*, 671 S.W.2d 559, 571 (Tex. App.—San Antonio 1984, writ dism'd w.o.j.) (affirming award of $25,000 for damage to reputation when plaintiff's employer, in a single incident, told plaintiff's coworkers that plaintiff was "a liar" and "not trustworthy"); *Whalen v. Weaver*, 464 S.W.2d 176, 181–82 (Tex. Civ. App.—Houston [1st Dist.] 1970, writ ref'd n.r.e.) (affirming award of $15,000 for a single incident in which the defendant, in the presence of three attorneys and "several unnamed and unknown parties," accused the plaintiff "of embezzling company funds and of being a thief").

We accordingly conclude that the record supports the award of $250,000 for past damage to Shaikh's reputation.

### 3. *Exemplary Damages*

Memon argues that the exemplary damages should be reduced because the awards of actual damages must be reduced. Since we have concluded that the actual damages need not be reduced, this argument is without merit.

We overrule Memon's second issue.

## C. Permanent Injunction

In his third issue, Memon argues that the findings necessary to support the permanent injunction were contrary to the jury verdict, and thus, the trial court erred in denying his motion to modify the judgment to eliminate injunctive relief. We review the trial court's issuance of injunctive relief for abuse of discretion. *Operation Rescue-Nat'l v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 975 S.W.2d 546, 560 (Tex. 1998).

Memon argues that the jury's assessment of $1 for future mental anguish

and $1 for future damage to reputation from Memon's past publication of defamatory statements means that (1) Shaikh can be adequately compensated in damages, (2) damages can be measured by a certain pecuniary standard, (3) the damages are capable of calculation, and (4) the future damages would be nominal. But the jury was not asked to, and did not, determine that injunctive relief was unnecessary. *See State v. Tex. Pet Foods, Inc.*, 591 S.W.2d 800, 803 (Tex. 1979) ("Although a litigant has the right to a trial by jury in an equitable action, only ultimate issues of fact are submitted for jury determination. The jury does not determine the expediency, necessity, or propriety of equitable relief.") (affirming injunctive relief prohibiting Texas Pet Foods from "causing or contributing or threatening to cause or contribute to the emission of odors and other air contaminants" around its rendering facility, even though the jury failed to find that the defendant engaged in this conduct).

The jury's finding that Memon's past publication of defamatory statements is likely to cause only nominal damages in the future does not imply that no additional damage would be caused if Memon *republished* the defamatory statements in the future to some unspecified audience. The trial court easily could have concluded that if Memon continues to republish the same statements and Shaikh must sue Memon a second time, it will be difficult to calculate the incremental increase in Shaikh's mental anguish and in the damage to his reputation while avoiding compensating Shaikh a second time for damages awarded in the first trial. *Cf. Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 775 (Tex. 2003) (explaining that "a tort victim should be fully and fairly compensated," but "a double recovery should be avoided").

Because Memon has not shown that the trial court abused its discretion in permanently enjoining him from republishing the defamatory statements that

already have damaged Shaikh, we overrule his third issue.[11]

### III. CONCLUSION

We conclude that even if the evidence is legally insufficient to support the jury's finding that Memon falsely stated that Shaikh owns or owned video stores for which sexually-oriented business licenses were required, any error was harmless because the statement was just one of nine factual bases alleged in support of a single theory of liability. Moreover, even if each statement could be considered a separate theory of liability, then Memon failed to preserve his appellate arguments concerning that statement with a timely charge objection. We further hold that the evidence supports the actual and exemplary damages as awarded, and that the permanent injunction imposed is not inconsistent with the jury's findings. We accordingly affirm the judgment.


/s/     Tracy Christopher
           Justice


Panel consists of Justices Frost, Christopher, and Jamison (Frost, J., concurring).

---

[11] Memon makes no constitutional argument about prior restraint of speech.